UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

SONDRA WILLIAMSON,

Plaintiff,

v.

AETNA LIFE INSURANCE COMPANY,

Defendant.

Case No. 2:17-cv-02653-RFB-CWH

**ORDER**

## I. INTRODUCTION

Before the Court is Plaintiff's FRCP Rule 52 Motion for Judgment on the Pleadings and Administrative Record. ECF No. 18. For the reasons stated below, the Court grants Plaintiff's Motion and enters judgment in favor of Plaintiff.

## II. PROCEDURAL BACKGROUND

Plaintiff filed the Complaint on October 12, 2017. ECF No. 1. Plaintiff seeks declaratory and injunctive relief and disability benefits pursuant to an alleged wrongful termination of benefits under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). Defendant filed its answer on November 17, 2017. ECF No. 5.

The Court entered a scheduling order on December 21, 2017, requiring Defendant to disclose a copy of the ERISA administrative record by January 15, 2018. ECF No. 8. Following stipulated extension of time, Defendant provided the administrative record on June 22, 2018. ECF No. 17.

Plaintiff filed the instant Motion for Judgment on July 6, 2018. ECF No. 18. The Court heard oral argument on this motion on March 6, 2019 and took the motion under submission. ECF No. 32.

### III. LEGAL STANDARD

In reviewing a claim administrator's decision pursuant to ERISA, a court's standard of review depends upon the terms under the benefit plan. A denial of benefits "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Where the plan grants discretion, abuse of discretion is the appropriate standard of review. Id.

The parties dispute whether the plan grants Defendant discretion and thus whether a de novo or abuse of discretion review applies. "There are no 'magic' words that conjure up discretion on the part of the plan administrator. . . . The Supreme Court has suggested that a plan grants discretion if the administrator has the 'power to construe disputed or doubtful terms' in the plan." Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006) (citations omitted).

The Court finds that the appropriate standard is de novo. This determination arises from a review of the record. Defendant filed two documents regarding the coverage in this case—a policy ("Policy") and a booklet ("Booklet"). Both of these documents outline the plan and policy coverage. By its own admission, Defendant allegedly filed the "wrong" Policy in the administrative record. It then sought to file the "Corrected Policy" with a supplemental filing. ECF No. 24. The Court finds, however, that the Booklet with policy number GP-811383 is the only confirmed operative policy document. The Court rejects Defendant's attempt to rely upon the Corrected Policy. First, the Booklet has the latest effective date (January 1, 2012) of the policy documents submitted. Second, Defendant has not filed with its correction any affidavit or other document authenticating and confirming that the Corrected Policy was the policy in effect for this case. Third, there are discrepancies as noted by Plaintiff as to the policy numbers on the Corrected Policy versus the Booklet. For all of the reasons, the Court rejects Defendant's attempt to rely upon the Corrected Policy.

Most importantly, the Court does not find that the Booklet contains language that confers or delegates discretion to the plan administrator or fiduciary. Defendant does not dispute this. The Court finds therefore that de novo review applies. However, the Court finds that the applicable

standard is immaterial in this case. The Court finds that benefits must be reinstated even under the higher abuse of discretion standard. The Court will analyze this case under the higher standard to avoid unnecessary delays as to benefits if appellate review would lead to a different determination of the standard.

In applying the abuse of discretion test, the Court considers whether it is "left with a definite and firm conviction that a mistake has been committed." Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 676 (9th Cir. 2011) (quoting United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)). To do so, the Court considers whether the plan administrator's decision was "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." Id. (quoting Hinkson, 585 F.3d at 1262). The Court is limited to review of the administrative record before the plan administrator. Abatie, 458 F.3d at 970.

### III. FINDINGS OF FACT

The Court may hold a bench trial on the basis of an administrative record and make findings of fact pursuant to Rule 52(a). Kearney v. Standard Ins. Co., 175 F.3d 1084, 1095 (9th Cir. 1999). "Although Rule 43(a) requires that 'testimony' be taken in open court, the record should be regarded as being in the nature of exhibits, in the nature of documents, which are routinely a basis for findings of fact even though no one reads them out loud." Id. at 1094. District courts are permitted to "try the case on the record that the administrator had before it." Id. at 1095.

Rule 52 requires the Court to "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). The Court must state findings sufficient to indicate the factual basis for its ultimate conclusion. Kelley v. Everglades Drainage District, 319 U.S. 415, 422 (1943). The findings must be "explicit enough to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the ground on which the trial court reached its decision." United States v. Alpine Land & Reservoir Co., 697 F.2d 851, 856 (9th Cir. 1983), cert. denied, 464 U.S. 863 (1983) (citations omitted).

/ / /

Accordingly, having reviewed the administrative record, the Court makes findings of fact in this case as follows.

**A. Plaintiff's Prior Occupation**

1. Prior to February 15, 2012 Plaintiff worked as a customer service representative for Bank of America.

2. Defendant utilizes the Dictionary of Occupational Titles in its assessment of insured's claims. The Dictionary of Occupational Titles defines sedentary work as follows: "Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met."

3. Plaintiff was employed in a sedentary position. Her job as a customer service representative required constant sitting (up to 10 hours per day), focus and concentration, and constant use of both hands for typing.

**B. Relevant Terms of Plaintiff's Policy**

4. Plaintiff was insured by an ERISA benefits plan provided by Defendant and maintained by Bank of America.

5. The plan pays a monthly benefit if the insured is disabled and unable to work. For the first 18 months, an "own occupation" test of disability applies. Thereafter, an insured must be unable to work at any "reasonable occupation." A reasonable occupation is any gainful activity for which the insured is, or may reasonably become, fitted by education, training, or experience and which results in, or could be expected to result in, an income of more than 60% of the claimant's adjusted pre-disability earnings.

6. Benefits terminate when Defendant determines that the insured no longer satisfies the test for long-term disability or when Defendant finds that the insured has withheld information

///

7. that indicates the insured is performing, or capable of performing, the duties of a reasonable occupation.

**C. 2012 Disability Claim and Award**

8. Plaintiff suffers from a cervical and lumbar fusion and degenerative spinal stenosis, causing severe neck, back, and shoulder pain.

9. On February 15, 2012, Plaintiff ceased working and submitted a claim for short-term disability.

10. On March 8, 2012, Plaintiff's disability application was denied based on lack of medical documentation. Plaintiff appealed, providing documentation from her spinal surgeon and pain management doctor.

11. On April 26, 2012, Defendant overturned its March 8, 2012 denial and awarded short-term disability to Plaintiff.

12. On July 26, 2012, Plaintiff submitted a claim for long-term disability.

13. On September 2, 2012, Plaintiff's short-term disability benefits ended because the short-term benefit period had been maximized.

14. On November 2012, Plaintiff's long-term disability claim was accepted for a maximum period of 18 months pursuant to the "own occupation" test. The award was back-dated and effective from September 3, 2012 through March 2, 2014. The award noted that Plaintiff's job required her to sit for long periods of time and that she would need time to recover from an October 22, 2012 procedure.

**D. 2014 Extension of Benefits**

15. On February 10, 2014, Robert Cirincione, M.D., a physician employed by Defendant, found in a report based upon the objective medical evidence that Plaintiff could not perform her own or any other occupation through at least September 30, 2014.

16. When the 18-month long-term disability period based on Plaintiff's inability to perform her own occupation expired on March 2, 2014, Defendant determined that Plaintiff could not perform any reasonable occupation. Defendant therefore continued to pay Plaintiff long-term disability benefits.

**E. 2015 Surveillance**

17. On May 20, 2014, Plaintiff reported to Defendant, *inter alia*, that she was no longer driving and that her friends helped her with groceries. On March 30, 2015, Plaintiff reported to Defendant, *inter alia*, that she could not drive and was using a cane to walk. On September 15, 2015, Plaintiff reported to Defendant, *inter alia*, that she could not stand for more than 15 minutes, used a cane, and could drive only seldomly.

18. On October 13, 2015, Defendant's internal notes reflect that Plaintiff's long-term disability benefits were approved to extend through April 30, 2017. Defendant's notes reflect that based on clinical information on file, Plaintiff had no functional capacity for long-term sitting.

19. Nine days later, on October 22, 2015, Defendant became aware of several Facebook posts made by Plaintiff seeming to show her traveling in California, posing on a motorcycle, boating, and regularly standing and sitting in apparent comfort. Defendant inferred from Plaintiff's Facebook posts that she was recently married. Defendant also discovered that Plaintiff had posted on a dating-oriented social media outlet the following message:
    > I am professionally employed and have been in Vegas for 8 years. Love motorcycles, camping, fishing, boating, and just in general having fun. I work hard and in turn like to play and have fun when the time comes. I need someone to have fun with again. 55 years old. Children: Live with me.

20. The information in the Facebook posts and on other social media was not independently confirmed as accurate by Defendant. Defendant had and has no basis for determining the accuracy or inaccuracy of the information posted.

21. On November 6, 2015, on the basis of these social media postings alone and without corroboration, Defendant ordered surveillance of Plaintiff.

22. Plaintiff was observed from December 6, 2015 through December 8, 2015. Plaintiff was not seen leaving her home on December 6 or December 7, 2015. Plaintiff was observed leaving her house once on December 8, 2015 for less than twenty minutes. Surveillance video on this date captured Plaintiff's activity from 11:32 AM to 11:43 AM. Plaintiff was observed performing the following activities:

a. Plaintiff drove herself and a child to the supermarket.
b. Plaintiff left the supermarket pushing a shopping cart containing six bags of groceries, a gallon of milk, and a case of water bottles.
c. Plaintiff loaded the bags from the cart to the car.
d. Plaintiff appeared to assist the child into a car seat before leaving.
e. Plaintiff drove to a U.S. postal box, exited the car, and placed mail in the mailbox.
f. Plaintiff drove back to her home. A man at the residence retrieved the water bottles and the milk, and Plaintiff gathered and carried inside the six grocery bags.

23. On January 6, 2016, Plaintiff reported to Defendant, *inter alia*, that she could not drive and could not lift anything greater than five pounds.

24. On January 8, 2016, Defendant sent a copy of the video to Plaintiff's treating physician to seek his review. Plaintiff's treating physician did not immediately respond with any records or comment.

**F. 2016 Termination of Benefits and Appeals**

25. On April 12, 2016, Defendant terminated Plaintiff's benefits on the basis of her social media postings and the grocery shopping observed on December 8, 2015.

26. Plaintiff appealed the termination of her benefits. Plaintiff provided the following explanations:
    a. Several of Plaintiff's Facebook pictures were re-posted from earlier dates, as far back as 2007.
    b. The motorcycle on which Plaintiff was photographed sitting was in a museum.
    c. Plaintiff was not married but was living with a roommate who helped her with chores.
    d. At the grocery store, Plaintiff used the cart for leverage and had to take a pain pill that day due to over-lifting.
    e. Plaintiff has "some good days, some bad, some just miserable."

27. Defendant never sought to independently verify the explanations of Plaintiff.

28. Defendant terminated Plaintiff's benefits on April 11, 2016. However, because Plaintiff

had shoulder surgery on April 20, 2016, Defendant reinstated benefits for an additional eight weeks to allow for Plaintiff's recovery from this surgery.

29. On June 15, 2016, Defendant ceased paying Plaintiff's benefits.

30. On June 20, 2016, Plaintiff again appealed the denial of her benefits. She included updated medical records and a letter from her treating physician, which responded to Defendant's allegations in Defendant's termination letter and opined that Plaintiff continued to be completely disabled.

31. Upon receipt of these updated records, Defendant referred Plaintiff's file for review by psychologist/neuropsychologist Elizabeth Gay, Psy.D. (though Plaintiff had not based her appeal on a psychological disability) and for a review by occupational medicine specialist Siva Ayyar, M.D.

32. On July 29, 2016, Dr. Gay's medical review resulted in a finding of no evidence that Plaintiff could not work. Specifically, the review found a lack of cognitive deficits due to medication side effects.

33. On August 2, 2016, Dr. Ayyar's medical review recognized Plaintiff's diagnoses and significant treatment history. Dr. Ayyar did not note any evidence in the medical record demonstrating improvement. Dr. Ayyar nevertheless summarily concluded without pointing to particular objective medical evidence that Plaintiff "should, however, be considered capable of performing full-time work." Dr. Ayyar did not specify whether Plaintiff could do sedentary, light, medium, or heavy work, nor did he comment on her training, education, or experience.

34. Dr. Ayyar based his findings in part on the surveillance video, which he interpreted to demonstrate Plaintiff's abilities to "shop independently, drive a car, assist a young child, stoop, bend, lift, carry, push, pull, conduct transactions at a grocery store, push a heavy grocery cart, retrieve heavy articles from her car trunk, etc." throughout the entire timeframe under review. Dr. Ayyar's report did not contemplate that this surveillance video was a single eleven-minute snapshot, that Plaintiff was not seen leaving her home throughout the two days proceeding this video, and that this video did not necessarily

capture Plaintiff's regular daily capacity to walk, drive, lift, or otherwise engage in movement or activities.

35. In his August 2, 2016 report, Dr. Ayyar concluded that Plaintiff has some medical restrictions, including the following: "Alternate positions of sitting and/or standing approximately twice to three times every 20-30 minutes so as to ameliorate symptoms of lower extremity pain and/or paresthesias if and when they arise."

36. Defendant requested that Dr. Ayyar provide a supplement to his report specifically to address whether Plaintiff could perform full-time sedentary work. In an addendum report on September 12, 2016, Dr. Ayyar concluded that she could do so based on the findings in his August 2, 2016 report. Because sedentary work requires "sitting most of the time," this conclusion is inconsistent with his analysis that Plaintiff must alternate sitting and standing twice to three times every 20-30 minutes.

37. Defendant then consulted with vocational rehabilitation vendor Joseph Thompson to perform a transferrable skills analysis. Defendant provided only Dr. Ayyar's addendum report and two questionnaires by Plaintiff, which noted that her former occupation requires constant sitting and typing.

38. The vocational case manager construed the addendum report to only impose restrictions related to Plaintiff's left arm as a result of her April 2014 shoulder surgery and identified three sedentary occupations he thought Plaintiff could perform.

39. On October 4, 2016, Defendant denied Plaintiff's appeal. In so doing, Defendant adopted verbatim the language of Dr. Ayyar's Addendum Report addressing restrictions related to Plaintiff's left arm but disregarded evidence of other restrictions.

## IV. CONCLUSIONS OF LAW

The Court finds that Defendant abused its discretion when it terminated Plaintiff's disability benefits absent medical evidence that her disabilities had improved.

To the extent Defendant relied upon Plaintiff's Facebook and dating website postings, the Court finds that such evidence is an illogical, implausible, and unreasonable basis for a revocation of disability benefits compared to the use of medical records. First, Defendant was aware of the

inherent accuracy issues with such postings. Second, Defendant never sought to independently verify the posted information beyond the limited surveillance. Defendant possessed no external evidence of when or where the posted photographs were taken. Defendant did not ask Plaintiff when those pictures were taken or seek additional context. Third, Defendant never sought to actually verify the explanations provided by Plaintiff. Fourth, Defendant did not weigh this inherently inaccurate information against the medical opinion of Plaintiff's treating physician and the medical documentation of her disabilities. Even assuming the photographs were posted contemporaneously, nothing in Plaintiff's medical record suggests that Plaintiff is physically incapable of standing, sitting, or posing for the time it takes to snap a photograph.

The Court notes that it was not an abuse of discretion for Defendant to use the information gleaned from Plaintiff's social media accounts as a trigger to investigate Plaintiff's ongoing disability status. However, the Court finds that social media postings are minimally informative and inherently inaccurate as to a person's medical symptoms and capacity for sustained employment. Such postings cannot plausibly constitute a basis for Defendant's 2016 disability determination.

The Court similarly finds that the eleven-minute surveillance video cannot constitute a basis for Defendant's disability determination within reasoned discretion. Over three days of surveillance, Plaintiff left the house exactly once to go to the grocery store. This is to say that Defendant obtained eleven minutes of limited activity from 72 hours of observation. The observations of Plaintiff shopping, including pushing a cart and lifting bags, were not inconsistent with Plaintiff's reports, which support pain-related fluctuations in her ability to walk and drive. Plaintiff does not have a physical inability to walk or drive, such as paralysis. Rather, Plaintiff has chronic pain, the nature of which is entirely consistent with her report that she has "some good days, some bad, some just miserable." Moreover, Defendant did not observe Plaintiff performing a recreational or optional activity that pushed the limits of her physical capacity; Plaintiff was grocery shopping, an essential task that sometimes simply must be faced regardless of whether it exacerbates one's pain. Finally, Defendant completely disregarded the fact the surveillance also clearly indicated 71 hours of inactivity outside of the home by Plaintiff. To put it in more stark

but clarifying perspective, Defendant observed eleven minutes of activity outside of the home compared to 4,309 minutes of inactivity—that is the outside activity represented 0.2% of the entire period.

Though the Court acknowledges that the standards differ, the abundant case law reviewing Social Security disability determinations provides useful analogies. In this context, the Ninth Circuit has explained that "impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." Garrison v. Colvin, 759 F.3d 995, 1016 (9th Cir. 2014). The Court cautions that "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998); see also Williams v. Sullivan, 967 F.2d 596 (9th Cir. 1992) (unpublished) (noting that allegations of disabling pain are not inconsistent with a demonstrated ability "to perform the various small chores that are necessary for day-to-day existence"). The Court finds that eleven minutes of video surveillance showing that Plaintiff obtained groceries, particularly in the context of a three-day surveillance in which Plaintiff left her residence only on this one occasion, is entirely consistent with Plaintiff's continued disability and cannot plausibly support, in whole or in part, Defendant's 2016 disability determination.

In response to Plaintiff's appeal, Defendant proceeded to obtain reviews of her medical record. Yet despite these additional opinions, Defendant can point to no objective evidence in Plaintiff's recent medical record to show that her cervical and lumbar fusion or degenerative spinal stenosis improved, or that her resultant pain subsided, since Defendant's award of long-term disability benefits in 2014. Indeed, the medical record shows that Plaintiff required a total shoulder replacement directly related to her chronic disabilities in April 2016, the same month Defendant terminated long-term disability benefits. Her records continue to chronicle ongoing physical therapy and pain.

Defendant argues that it carries no burden to distinguish its 2014 benefits determination from its 2016 determination. It argues that even if the evidence in 2016 does not support an improvement of Plaintiff's medication condition since 2014, Defendant has the unilateral power

to determine whether Plaintiff can work at a reasonable occupation without reference to its earlier decision. The Court disagrees. While Defendant is certainly not bound by its 2014 determination and need not overcome any substantial evidentiary burden to make a different determination in 2016, the Court finds that Defendant must at least show the objective medical reasons for changing its determination. It could have shown this in various ways, including pointing to new medical evidence that supports its 2016 determination or providing an objective review that explains that its 2014 determination was in error. The Court reaches this conclusion because it finds that the objective medical evidence in the record supported Defendant's 2014 determination. Defendant must therefore point to objective medical evidence to support the reversal or revision of its 2014 determination. In other words, there must be *a reason*, supported by medical evidence, for Defendant's decision to find Plaintiff capable of performing a reasonable occupation in 2016 when she was not capable of doing so in 2014. The abuse of discretion standard, while highly deferential, must still have some teeth; otherwise, review by this Court is meaningless. A reversal of a medically supported previous award of benefits for no identifiable reason constitutes the definition of arbitrariness and hence an abuse of discretion.

## V. CONCLUSION

For the reasons stated in this opinion,

**IT IS ORDERED** that Plaintiff's FRCP Rule 52 Motion for Judgment on the Pleadings and Administrative Record (ECF No. 18) is GRANTED.

**IT IS FURTHER ORDERED** that Defendant's termination of Plaintiff's long-term disability benefits was an abuse of discretion and that Plaintiff's benefits are ordered reinstated.

**IT IS FURTHER ORDERED** that the Clerk of Court is instructed to enter judgment in favor of Plaintiff and close the case.

DATED: <u>March 31, 2019</u>.

_____
**RICHARD F. BOULWARE, II**
**United States District Judge**